and can we call the next case please? 16-0157 People v. Keith Talbert. Great. Will counsel on People v. Talbert please approach. Identify yourselves, tell us who you represent and how much time you'd like. Good morning, Your Honor. Stephanie Fuentes from the Office of the State Defender on behalf of Keith Talbert. I would like to reserve five minutes for rebuttal. And how much would you like for your opening argument? Fifteen. Fifteen and five. Okay. Good morning, Your Honor. This is Assistant State's Attorney Brian Levitsky on behalf of People. We would also ask for fifteen minutes. All right. All right. And Ms. Fuente, whenever you're ready. May it please the Court, counsel? I will be focusing on the first issue, the other crimes issue, but I'm happy to answer any questions you might have of the ineffectiveness claim. The admission of prior bad acts by a third party is governed by People v. Pikes. Under Pikes, these acts are admissible as motive evidence only if there's a connection between the prior acts and the charged offense. And only if the probative value substantially outweighs the prejudicial effect. Here, the State failed to show that Keith Talbert was motivated to assist his cousin, Richard Talbert, in retaliating against the Wardlaw-Hanson family because there's no evidence that Keith was asked or instructed by Richard to act against Anthony Wardlaw or that Keith was aware of Richard's prior acts or that he shared Richard's hostility towards the family. So what about the drive-by on the day of the shooting, the first drive-by where both Keith and Richard are in the car, and Anthony hears Richard say, get that one there. And Keith looks at Anthony and shakes his head, and then five minutes later drives back and shoots Antonio. Why isn't there an inference that can be drawn from that that Richard enlisted Keith to help him exact his revenge? Because under Pikes, there's just not enough information as to what happened during that interaction in the car. We have Anthony was unsure of what he heard. He said, I think I might have heard a statement being made of, oh, that's, to be effective, that's Anthony over there. But aside from that, it wasn't as if Keith or Richard had told Keith, oh, that's Anthony over there. Go get him. He's the one who doesn't want to sell drugs for me. If we had that, we probably wouldn't be here. So isn't there an inference to be drawn from what Anthony heard that Richard had enlisted Keith to help him do what he said he was going to do? Well, there's just not enough testimony to establish that Richard instructed Keith. There's no explicit instruction. I know the state likes to frame that, frames the issue as that way, but it's because it was framing some of the facts. The facts don't show, or the facts show that Keith drove to the scene. It wasn't as if Richard drove him to the house for the five minutes before the shooting. We also see under Pikes, there was more evidence. There was competent evidence by several eyewitnesses who said that they heard Pikes and his co-defendant, Donagan, talk about a prior incident that served as the catalyst of the drive-by shooting. And that during that conversation, that Donagan had recruited Pikes to assist him in the shooting and that Pikes had agreed in retaliating. There's just not enough to know why they were there. The statement alone, even if you said that's Anthony over there, you cannot infer that Keith was aware of the prior incidents or you can't infer that Richard recruited Keith for assistance specifically because Anthony refused or that Keith was motivated and agreed to assist Richard in retaliating because also there's no other evidence to show that he was aware of those prior incidents. Was there any evidence to show that Keith and Anthony knew each other before this? Their family. And just because their family... Keith and Anthony. Keith and Anthony, no. So when Keith, having driven by with Richard, who does know Anthony, comes back alone and says to Anthony, get your down here, again, can't an inference be drawn from that? No, nice bespoke, your honor. What Anthony testified is that he had seen Keith in the neighborhood before. He never talked to him or had any conversations with him. In fact, he said he didn't even know Keith's name or his nickname until after the shooting. So he's seen him before, but I don't know, there's just not enough evidence there that the state presented of how they knew each other or even if, for example, there's no Because those prior incidents were from Richard and Anthony's dispute over whether Anthony was going to sell drugs on behalf of Richard. And because he didn't, that's why he made threats and he also threatened to have somebody burn down their house, which did occur. But there's no evidence showing that Keith was part of this greater conspiracy or that he was even, that he even worked for Richard or part of the same gang, just that they were cousins. And they happened to see, they just happened to see them together five minutes before the shooting. Because it's... They lived together, right? It's unclear if they lived together. They shared, at least they shared or they provided the same address, but it's unclear whether they lived together. Keith's prior girlfriend, wife, testified saying that he might stay there, but he might have stayed somewhere else. So it's unclear if they lived together. There's also a third person, there's some testimonies, a third person that the police officers had stopped to do a contact on him, and his name was Daryl Talbert, and who also gave the same address, that were related to Keith and Richard. So it's just, we're unsure. And another thing is that, while we can't infer that Keith had instructed, I mean that Richard had instructed Keith to act, was there's a lapse of time between the prior incidents that occurred and the shooting. There was, I believe, two weeks from the prior incidents. There was a September 10th threats, and then the September 11th was the arson. And there's two weeks go by before the shooting, because the shooting occurred on the 25th. We don't know what happened there. It's unlike Pikes, where Pikes and the co-defendant Donegan, they immediately planned the retaliation the day after that scooter shooting incident. So because it was so closely tied, we could infer, even if there was no specific instruction or specific agreement, we could infer that Pikes had knowledge of the prior shooting, and that's what motivated him for this current drive-by. There's two weeks. The three of them all lived in a drug-infested, crime-ridden community. We don't know if there's something else. We just don't know. We don't have it in the record as to, you know, was there a beef between Keith and Anthony. We just don't know. We're here examining whether the trial court abused its discretion in allowing this evidence in, correct? Yes. And you've been talking about Pikes, but there are a couple other cases, Lopez and Morales, right? Yes. And all three of these cases, all three of those, were tried in front of the same judge who was the trial judge in this case, right? Right. So if there's any judge over at 26th Street who's sort of familiar with the permutations of the Pikes holding, it would be Judge Lynn, correct? Correct, but also Judge Lynn was overturned several times based on his ruling. He was overturned and so was I in the Pikes case, because I was on that panel too. So both of us are quite aware of it. Yes. I can understand why the defendant would want to keep these two incidents out, because then it looks like just a random act and there's no way that you can tie him to this. But the fact of the matter is that there were two incidents involving Richard's bad acts, and one of them directly communicated information to the defendant, Keith Talbert, here. And to keep that out would be an abuse of discretion, it seems to me. Your Honor, I disagree. I mean, there's not enough communication there. Just a pointing at Anthony, a nodding head, I mean, we just don't know. It's too speculative. You were saying that at times the co-defendant didn't come in against the Lopez defendant, because the appellate court found that there just wasn't a tie, even though they saw the Lopez defendant with his co-defendants on the day of the prior incident occurred. There still has to be something more. If we were to just assume there's a... the law doesn't allow us to assume or speculate. And we just don't know why or what exactly this says. Well, it seems to me that unless this evidence came in, the jury would be doing nothing but speculate as to why on earth would he just all of a sudden come up here five minutes after he was there before with his cousin and then just shoot at this family. Well, Your Honor, I would disagree. There's a lot of cases that involve drive-by shootings or different homicides that the state chooses not to present a motive or motive evidence. But there are also plenty of cases where there's evidence indicating that they go by and they look to see who they're going to shoot. This person's from this gang because they have their hat this way or they've got some kind of a symbol on them. Then they come around the block and boom, and they shoot. What's different about this case? What's different is because Keith and Richard were not charged as co-defendants and Richard was not charged with conspiracy, the state, when it set out to prove the motive, the state had to tie the motive to Keith on trial and that he had that motive at the time when the there's no testimony, there's no evidence that Keith participated in those prior crimes or we don't even have to do that now under Pikes, that he was even aware of the prior bad acts or that he shared Richard's hostility. This is, we don't know if they're part of the same gang. If they were, then we would be in a different ballpark. We would be in Pikes where we had testimony that this shooting was, the background of the shooting was this gang warfare between the Gangster Disciples and the Four Corner Hustlers. Here, we just, we don't know. Annette and Anthony were like, yeah, we never saw Keith. Annette said, oh, I didn't even see Keith before the shooting. And both Anthony and Annette were consistent, cooperated with each other and said, we never saw him selling drugs with Keith or for Keith. And she testified about how Keith was, I mean, with Richard and she testified how Richard controlled this group of shorties who sold drugs. I know you disagree, but it seems to me anyway that there's plenty of circumstantial evidence presented by these two incidents to talk about the motive both of Richard and of Keith and that it was proper for the court to allow this testimony. Considering the Supreme Court's decision in Pikes. Right, but even under Pikes, there's just not enough. There still has to be a connection and there still has to be some awareness or something to tie Keith to those prior incidents and they're not. And, Your Honor, even if you were to consider that they had some type of probative value and should have come in, they were still a prejudiced Keith. And I know that under after Pikes, the concern isn't anymore this propensity, right, for it to come in, whether it shows propensity of the defendant or his association of being a bad person. But it would only be Richard's propensity. It wouldn't be Keith's propensity because he wasn't involved in the prior. Correct, but we would still analyze whether he was prejudiced by the introduction of these prior actions under one of the rules of evidence. And here he was prejudiced because there was so much testimony. He was identified as the shooter. I mean, how can you claim unfair prejudice when there was specific identification by two people here? But that was, aside from his identifications, the rest of the evidence and the nature of the evidence that came in with these other acts, it's just not enough. There were some inconsistencies in the testimony of the initial descriptions by both Annette and Anthony. You lost me. Well, there, I mean, just what I'm trying to say is... No, I'm not saying that you're making, you're not making your point clear. I'm just saying that you're not persuading me. I'm just saying that it's still under prejudice, even basic rules under Pikes, you still have to consider whether the evidence had some, in some manner, misled the jury to believing, or not just believing, but also incorrectly assessing the remainder of the state's evidence. I don't know that that's necessarily the right standard. It's simply whether or not the probative value exceeded, or the prejudice was more than the probative value of the evidence. And I don't know how you can say that in this case. Well, just to show why we argue that there was prejudice. In Pikes, the testimony was limited to these two incidents. Here, it was not just testimony about the September 10th and the September 11th incident. We had the state previewing Richard's other crimes all throughout their opening. We had testimony about the extensive drug dealing of Richard, which was never connected to Keith, through Anthony and the detective. You've told us 20 times, but what the defense, the case the defense wanted to have tried was one in which a driver comes up and just randomly shoots at this family. And to keep out any evidence of what this family had been through, and what the kind of problems that they had with the drug dealing in their neighborhood and trying to recruit the youngest member of their family in it. And I know you'd like to have all that in a vacuum, but that evidence is relevant in proving what were the circumstances that led to this young man's death and his mother's injury. Your Honor, the evidence, we don't want it to be in a vacuum. We just want to make sure that the state proved a connection between Keith and those prior incidents that involved I agree. I hear you. Okay. Do you want to address briefly your ineffective assistance argument? And my question on this is you say counsel promised something in opening statements that she didn't later deliver. And this is obviously devastating for the defendant's case. And so we should assume that she didn't speak to these people and she made a promise to the jury as to what they would say, not knowing what they would say. That's the assumption, right? Right, that she did properly investigate. These four witnesses were not disclosed by the state and they were not included in the police reports and they were not interviewed by police, right? I believe that's what the prosecutor said on the record, yes. So, well, I think we could probably look at the record and say their names aren't anywhere. Right. There was some questions about that. And the trial court asked on post-trial. Exactly. And so in order to find, so we know their names came from somewhere. And I would assume that they came from defense counsel doing a little digging around the neighborhood and finding these people. Why should we assume that she didn't speak to them? Not so much just that they didn't speak, but thoroughly investigated, meaning that if you're going to call up, if a defense counsel is going to call up a witness, she should have at least be prepared to perfect any impeachment or any flipping that might happen with the witnesses. And that would be. That's not the argument you raised, that she was ineffective because she didn't perfect an impeachment of her own witnesses. I understand, but I was just trying to say that the reason we said that she did not properly prepare was just that he didn't anticipate what could have happened and had that information available to him if necessary. I mean, the state does this all the time. The state makes an opening statement and they say, you're going to hear from six witnesses, and this is what these witnesses are going to tell you. And then the witnesses take the stand and say, I never said that. I never, I don't remember even being at the police station. I certainly didn't give them a written statement. And so, I mean, it happens to the state all the time. Why wouldn't we assume that this is what happened to defense counsel? These witnesses told her, and I thought it was her, that they saw the shooter's face and it wasn't that guy sitting at counsel table. And when they got on the stand, they thought better of it and they said, I didn't see anything. And how would that be ineffective assistance? It would be ineffective assistance because counsel overpromised in opening statements. Instead of saying, you're going to spot here three witnesses who said they were standing directly in front of the house at the time of the shooting and they didn't see, they saw the face of the shooter and it wasn't Keith. Instead of making those specific promises, it should have been like, you're just going to hear some, you're going to hear witnesses who say another story. And that's ineffective assistance. Well, it's ineffective assistance because he did not properly... That's pretty much hindsight, isn't it? In hindsight, I wish I hadn't made that promise. I'm sure that trial court would have said the same thing. Even if you imagine that it was, how can you prove that it's prejudice based on the other evidence in the case, the identification? I mean, again, the initial identification that led them to investigate Keith Pikes, there were some problems with it. Anthony said he was eight feet away. There was also a gun present at the time. And there's scientific studies saying that the presence of a weapon in a stressful situation can lead to some doubts as to the identification. It's not saying that he lied, it's just saying that there were some issues. He also said that Keith had dreadlocks that covered his face. These things were things that should have, if they had provided these defense witnesses, would have helped the defense. Which, by promising that you're going to have exonerating evidence or something that's going to help your client and not presenting that, that's going to leave a question to the jurors' mind as to, okay, what happened? What's going on? And not thoroughly consider the defense's theory of the case. If you have no further questions, I'll reserve some time for you both. Thank you. Thank you, Ms. Quinton. Mr. Levitsky. Good morning again, Your Honors, and again, Assistant State's Attorney Brian Levitsky. On behalf of the people, may it please the Court, the jury in this case had every right to know that the reason that defendant pulled the trigger or fired those shots at Anthony that struck Annette and that killed Antonio is because Richard was terrorizing this family for weeks before and because Annette dared to stand up to him while she said no, and Richard brought defendant to this shooting scene. The defendant was driving, though, right? Right. Okay, so the defendant brought Richard. I think we infer that the reason the defendant was driving there is because Richard was going to point out Anthony, which is what he did. Why did you need all this stuff about Richard? You had two eyewitnesses that Anthony said he'd seen the guy in the neighborhood, he looked at him, he did not know his name, but he identified him in the photo array and the lineup. Annette said she hadn't seen him before, but she ID'd him in the photo and the lineup. Why do you need all this stuff about Richard? You don't need motive. The people were not required to prove motive, but when you have a situation like a drive-by shooting, the jury might wonder why this happened. Isn't it just piling on, doubling up, covering all your bases, making sure that you get this planted in the jury's mind? If you don't need motive, why do it? The reason that we prove motive when we do is because the jury wants to know why this happened. They want to hear the story. Why did the defendant pull that trigger? It was enough to show that he was the individual and that we let the elements of first-degree murder and attempts of first-degree murder not have been discharged with a firearm. But the jury still wants to know, in cases like this, why it happens. They want that story that makes them say, I understand this now and it was wrong and we're going to sign the verdict in such a way. It certainly makes your case stronger if you have a motive. Absolutely. But you don't need it. Again, the law is clear. We're not required to prove motive. But it is certainly relevant in this case, which is all PIPES requires is that relevance inquiry. And as I think this court has put in better words than I could have previously in discussing with counsel, this evidence was extraordinarily relevant. And we can look at it in terms of providing a motive where a defendant and Richard were working together or whether a defendant adopted Richard's motive when he agreed to accept and to act on Richard's order by coming by again and firing the shots. But we don't know that Richard ordered him to do anything. There's no testimony. There's no evidence of that. There's no direct evidence. But what we do have is we have Richard pointing out Anthony, calling him out. You could have said that's the guy that took my jacket. That's the guy that I went to school with. That's the guy that's dating my sister. That's the guy I met at the grocery store the other day, and he picked up my groceries for me when they fell on the floor. That's the guy. It could have been anything. That's the guy who. But we have to look at all this evidence together, and we have to put it in this appropriate context. We have a defendant showing up with Richard, moments, minutes even, before this offense happens. He points out Anthony. He calls him out by name. Defendant shakes his head. He's agreeing to do something, and what defendant agrees to do is what he did only minutes later. He comes by. He calls out Anthony using the same language that Richard used moments again, fires those shots. That was an agreement to accept this hit order that Richard placed, and we know why Richard placed it. It's because this felon stood up to him, and the jury had a right to hear that before they were asked to sign a guilty verdict. Let's be explicit here. It wasn't that he pointed and said, that's the dude I went to high school with. What was it that the testimony was that he said when he pointed at Anthony? He said it's that guy right there. He used very derogatory language when he did so. It's in the record. Just say what he said. He said that. He said that bitch-ass nigger there, right? Correct. That's what he said, right? You've tried dozens of cases and heard dozens of cases in the African-American community in Chicago. Is it possible that that term has more meaning to us sitting here than it does in the neighborhood? Yeah, I don't feel like I can make an appropriate response to that. However, I would say that the jury could look at this, look at all these facts, and say that what we have here was defendant exacting revenge is the word that Justice Mason, you used earlier, and the defendant pulled the trigger for that reason. And, again, if Justice Larvin, as you pointed out, we're looking at an abuse of discretion here. This was a court that was very familiar with Pikes and Lopez and Morales. It took time to consider the application of this situation where we don't have a co-defendant, we don't have that direct evidence that we're asking to make inferences about the defendant who was actually charged, why the evidence was admissible and relevant as to him, exercised discretion and did not abuse it in finding that the jury had a right to hear this evidence. And even if the court did somehow possibly abuse his discretion in this case, the defendant absolutely was not prejudiced because, Justice Picheski, as you noted, we have these consistent eyewitness identifications from Anthony. That just goes back to my first question. Why did you need it? You had the eyewitness testimony that was totally consistent. Right. So you bolstered your case with something that we're arguing about now. Your Honor, what we did was we provided an explanation to the jury. And if there was any prejudice, You could have presented a weaker case, right? Yeah. The people aren't required to present a watered-down case. If we think about cases like Old Chief, the jury expects that the people are going to present their cases fully and to present the facts accurately in all the proper context. But one thing that we should also bear in mind when we're talking about whether this is prejudicial, again, we're just looking at it under ordinary 403 principles. It's whether the evidence was substantially outweighed by unfair prejudice. And it wasn't in this case where any prejudice would go to Richard, not the defendant. For the same reason that the defendant wasn't present at the threat and at the grocery store or present at the ice rink, as far as we know. And for those reasons, this Court should affirm defense conviction for, should affirm the ruling of the trial court in allowing this evidence in. If there are no further questions on that issue, the only thing I wanted to address just with the ineffective assistance of counsel issue is that the question isn't just whether counsel promised something in opening statements, which wasn't delivered. The test under Linfield is whether any error was so grave that had it not occurred, the result would likely have been different. That's in paragraph 20. And the result would absolutely not have been different in this case. In addition to the fact that we have that strong, overwhelming identification evidence, the thing that the defendant promised was that you're going to hear evidence that the defendant wasn't a shooter. And he still developed that thing through cross-examination of the people's witnesses, pointing out the discrepancy between the tips of the defendant's dreads and the scar that Annette said was on his face that apparently didn't appear in the photograph. The same facts that the defendant points to that argue prejudice, counsel made those same points to the jury, which rejected it. Actually said they didn't see him acting, right? One of the witnesses who was there, where the promise was he was going to call four witnesses, two were going to say that they looked at the shooter's face and it wasn't the defendant. The actual evidence that was presented in the defendant's case in chief came from Ms. I believe it was pronounced Kadijah Ricks, who said she knew the defendant but didn't see him. And the others didn't see the shooter. So, again, the same type of defense was still advanced through the people's witnesses. And so we don't have a situation really that's comparable to either Bryant or Davis, which are defendant's sites. And we have to look at the record as a whole, as opposed to judging counsel's actions and conduct in hindsight. Is the trial court noted? Is the support noted? It's just very possible that counsel was flipped by these witnesses. And if there are no further questions on that issue, for the reasons stated here, I believe you would ask this court to affirm the rulings of the trial court, to affirm the defendant's convictions, for first degree murder, attempt first degree murder, and aggravated discharge of the firearm. Thank you. Thank you. Ms. Blounte? Your Honors, just to clarify some of the facts that the state cited, from what my recollection of the record, it was Keith who drove Richard to the Boardwall Johnson home. And it was also Keith who said the phrase that the jazz nigger over there. It wasn't Richard. And that's based on Anthony's testimony. So based on that, there's just not enough for an instruction. As Justice Pichinsky remarked, we don't know what he meant by using that word, I mean that phrase. It might have been something, it might have been for another reason. We just don't know. And because of that, there's no specific instruction, and everything that came in regarding the Boardwall Johnson family was related to Richard and shouldn't have come in when there was no connection. The other issue is regarding the need for this explanation. Because there's no instruction, there's not enough to say that Keith was exacting revenge. That's an overstatement based on the evidence. There's just not enough. And, again, we're seeing that there is some prejudice in that there exists a very real risk of the jury overvaluing or being misled by the state's use of the third-party acts. As to the second point. They weren't misled. The evidence of two eyewitnesses is that Keith shot this boy. Misled by the introduction of Richard's prior bad acts. Even if it wasn't there. Even if it weren't there, rather. They still have two eyewitnesses that said that's the guy. It's possible. We just don't know. I mean, there are identifications, but aside from those identifications, there's no physical evidence. Keith didn't make an incriminating statement. And there's just nothing else to connect him, aside from this. At least one eyewitness is enough. Sure. Now you have two. They're very specific, very positive. Even without the motive evidence, they've still got enough. Possibly, but then why did the state need Richard's prior bad acts to come in? I mean, if the case wasn't that strong. Let me ask that question. Yeah, if the case wasn't that strong, why did they need it? Does the state have to refrain from proving motive when they have the evidence? No, it's just that the motive needs to be. They have to meet basic relevancy thresholds, but there has to be a tie. And even circumstantially, there's not enough of a tie between Richard's prior bad acts and Keith Talbert. So it's just a coincidence that Richard had been terrorizing his family and that Richard was in the car with them and that Richard and Keith lived in the same house and that Richard and Keith were cousins. It's just all a complete coincidence. No, not a coincidence. There's just not enough evidence to show that he was motivated by the same reasons. And Keith might have had his own personal reasons for going after Anthony. We just don't know. And if they were so connected, why didn't the state charge them as co-defendants? Why didn't they charge them with conspiracy if that connection, that agreement, is so strong? So now we're supposed to look at the state's motive? No, no, no, no. I'm just saying that if we're considering it in fact... I know you're trying to look at your client, but we're not here to talk about the state's motive and whether or not the state should have charged somebody else. No, but even under conspiracy, that would be Keith. No, this isn't a prosecutorial malpractice case where we're saying why did you prove such a good case when you could have proved a weak case? Or why didn't you indict somebody else? No, I understand. I'm just saying that if the IDs are so solid, they just didn't need all this other stuff coming in. As for the ineffective assistance of counsel claim, just briefly, the prejudice isn't whether the outcome would have been different. It's more as to whether it undermined the confidence of the jury, our confidence in the jury's verdict. And when you promise to present exonerating testimony and you don't, the juries love to wonder why. Why wasn't that presented? And we'll devalue anything, other evidence that was presented to support the theory of defense. Okay, wait a minute. You want us to believe that the jury, to agree with you, that the jury is left to wonder why if the defense counsel doesn't produce all the witnesses he promises, but you don't want us to believe that the jury is left to wonder why Keith killed this guy, this boy? No, Your Honor. You don't want us to believe that the motive belonged in there. You're saying the state shouldn't have introduced the motive because the jury didn't need to know why Keith did anything. But you want us to believe that the jury does want to know why the defense counsel doesn't do something. And I find that inconsistent. No, it's just because based on the – it's not asking – I guess that's too absolute to ask. It's just saying that when defense counsel promises something, there has to be an explanation. That's it. If Your Honors have no further questions, Keith Talbert would ask this Court to reverse his convictions and remand for a new trial under either the other crimes issue, the ineffective assistance of counsel claim, or under both issues. Thank you. All right. Thank you, Ms. Fuente and Mr. Levitsky. Excellent arguments. Excellent briefs. We will take the matter under advisement, and the Court will stand in recess. Thank you.